E-FILED
Sunday, 15 November, 2026 11:06:19 AM
Clerk, U.S. District Court, ILCD

**IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>JOSHUA R. DONAVAN,<br>Defendant. | Case No. 4:10-CR-40054-JEH-RLH |

## Order & Opinion

Now before the Court is Defendant Joshua R. Donavan's counseled Amended Motion for Early Termination of Supervised Release (D. 126).[1] The Government opposes the Motion. For the reasons set forth infra, the Court grants the Amended Motion and finds the Defendant's pro se Motion for Early Termination of Supervised Release (D. 123) moot.

### I

### A

In July 2010, Joshua R. Donavan was charged with conspiracy to distribute oxycodone and methadone and distribution of oxycodone. On August 11, 2011, Donavan pleaded guilty under a written plea agreement to Counts One and Two. On December 13, 2011, the Court sentenced Donavan to concurrent terms of 240 months' imprisonment on each count, which was the mandatory minimum term because a death resulted from the offense conduct. The Court imposed concurrent mandatory minimum three-year terms of supervised release, although it could have imposed up to a lifetime of supervision.

While serving his term of imprisonment, Donavan filed several post-conviction motions for release or a reduced

[1] Citations to the electronic docket are abbreviated as "D. ___ at ECF p. ___."

sentence. In 2020, he moved for compassionate release; the Court denied the motion and his subsequent motion for reconsideration. The Court later denied an emergency motion for interruption of sentence in 2021 and a motion to reduce his sentence in 2022. In November 2023, Donavan again sought compassionate release or a sentence reduction, and the Court denied his motions on March 1, 2024.

Donavan was eventually released to a halfway house on September 9, 2024, and thereafter released to supervised release on September 25, 2025. One year later, on September 25, 2026, he filed a *pro se* Motion for Early Termination of Supervised Release. On September 28, 2026, the Court appointed the Federal Public Defender and directed counsel to file an amended motion or status report within fourteen days. On October 8, 2026, through appointed counsel, Donavan filed an Amended Motion for Early Termination of Supervised Release. The Government filed its response on November 9, 2026, opposing early termination and requesting that the Court deny the motion. (D. 131). The Government further reported that the U.S. Probation Office does not support early termination of Defendant's supervision.

As of the date of this Order, Donavan has been on supervised release for fourteen months.

**B**

From August 2009 through February 2010, Donavan, who was affiliated with the Low Riders street gang, sold at least 1,200 oxycodone pills to codefendant Logan Gaylord. Gaylord consumed some of the pills and redistributed the remainder. Donavan also sold oxycodone, methadone, and Xanax to Bennett Holmquist.

On February 24, 2010, Gaylord sold some of the pills he had obtained from Donavan to Kelsey Demaught, who provided them to nineteen-year-old Ryan Evins. Evins ingested the pills and died the following day. During a search of Gaylord's residence, officers found additional oxycodone pills supplied by Donavan, a pistol, a sawed-off shotgun, and a rifle with an obliterated serial number.

On February 27, 2010, Holmquist was found dead at his home in Moline after ingesting a lethal amount of methadone the preceding night. Although Holmquist had been one of Donavan's customers, investigators could not determine who supplied the methadone that caused his death.

On August 11, 2011, Donavan pleaded guilty to conspiracy to distribute oxycodone and methadone and distribution of oxycodone. As part of his plea, Donavan admitted that he had supplied oxycodone pills to Gaylord and that some of those pills were redistributed to Evins, who ingested them and died. Donavan accepted responsibility through his guilty plea and his agreement with the Government's account of the offense. His criminal-history category was Category I.

During the final five years of his incarceration, Donavan was housed at a minimum-security facility without a fence and was assessed as presenting a minimum risk of recidivism under the Bureau of Prisons' PATTERN system. While incarcerated, he worked to establish a foundation for reentry by fostering relationships with his two adult stepsons and two younger stepdaughters. He also developed a relationship with their mother, Kristin Donavan, whom he married on December 12, 2021.

Donavan entered a halfway house on approximately September 9, 2024, before beginning his term of supervised release on September 25, 2025. His transition included two months in the halfway house, four months on a halfway-house ankle monitor, and six months on a location-monitoring device.

Donavan initially worked in Peoria and traveled to visit his family before obtaining employment with Amazon and transferring to Davenport to be closer to them. He remained with Amazon until July 2025, when he began working in Arconic's laboratory department. At Arconic, Donavan works as a laboratory technician determining metal hardness, using skills acquired through on-the-job training. He joined United Steelworkers Local 105 and became a union steward.

Donavan has maintained stable housing and employment while on supervised release. He has remained law-abiding, incurred no known violations, and complied fully with the conditions of supervision. He has maintained a good relationship with his probation officer and reported that supervision did not impose a substantial hardship.

Donavan and his wife have a seven-month-old daughter, and he is an involved stepfather to his wife's four children. His wife, children, and extended family have provided continuing support during his transition from incarceration to community life. Although Donavan initially experienced anxiety and felt overwhelmed by ordinary activities such as shopping and being in crowds, his family helped him adjust. His sustained employment, family responsibilities, stable living circumstances, and violation-free conduct have continued through more than one year of supervised release.

## II

### A

Donavan argues that early termination is warranted because he has completed more than one year of his three-year term of supervised release and has successfully transitioned back into the community following a lengthy incarceration. He contends that the first year following incarceration is ordinarily the most difficult period of reintegration and that his successful completion of that period provides persuasive evidence of rehabilitation and a lack of danger to the public.

Donavan emphasizes that he has remained law-abiding, incurred no violations, and fully complied with every condition of supervised release. He further states that he has had no disciplinary incidents or drug use during the approximately two years since his release to a halfway house and that, during his final five years of incarceration, he was housed at a minimum-security facility and received a minimum recidivism-risk score under the Bureau of Prisons' PATTERN assessment. In his view, this record demonstrates his ability to manage his affairs lawfully without continued federal supervision and

establishes that early termination would not jeopardize public safety.

Donavan also relies on his employment, financial stability, and community ties. He further maintains that early termination could open additional opportunities for advancement in his career. Donavan identifies his family as a strong and encouraging support system that guides his decisions and future plans. He explains that his family supported him while he adjusted to life outside prison and that their patience helped him continue progressing through the reentry process. He asserts that his employment, stable housing, family responsibilities, and prosocial support demonstrate that he is thriving and has established a framework that will help him avoid recidivism without further supervision.

Donavan further argues that supervised release has fulfilled its rehabilitative and transitional purposes. He states that he accepts responsibility for his past conduct, has changed substantially during and after his incarceration, and intends to serve as a positive role model for his children. Accordingly, he maintains that continued supervision is unnecessary and that his conduct and the interest of justice support termination of the remaining term.

**B**

The Government responds that early termination is premature because Donavan has completed only slightly more than thirteen months of a three-year term of supervised release, which the Government characterizes as relatively short for a drug case. The Government acknowledges that Donavan is employed, has no known violations, maintains a good relationship with his probation officer, and appears to be doing reasonably well. It nevertheless argues that compliance with supervision is required and does not, at this early stage, establish that termination is warranted.

The Government also represents that the United States Probation Office and Donavan's supervising officer do not support early termination. According to the Government,

Donavan told his supervising officer that supervision was not much of an imposition and that he sought termination after one year to determine whether the Court would grant it once he became statutorily eligible. The Government therefore contends that continued supervision imposes minimal inconvenience and has provided benefits and rehabilitative resources to Donavan.

The Government principally relies on the nature and circumstances of Donavan's underlying offenses and the consequences of potential recidivism. The Government emphasizes that Donavan admitted distributing the oxycodone pills to Gaylord and that some of those pills were redistributed to Evins and caused his death. In the Government's view, the offense conduct was exceptionally serious because at least one person died from a drug overdose as a result of Donavan's criminal conduct. It argues that the consequences and public costs would be particularly severe if Donavan returned to his prior conduct, making the need for deterrence and protection of the public especially acute. The Government maintains that Donavan and the public would both benefit from continued supervision and from the rehabilitative resources available through the United States Probation Office. It therefore asks the Court to deny the motion.

**III**

Under 18 U.S.C. § 3583(e)(1), after a defendant has completed at least one year of supervised release, a district court may terminate the remaining term if, after considering the specified § 3553(a) factors, it is satisfied that termination is warranted by the defendant's conduct and the interest of justice. The one-year requirement is the statute's only temporal threshold.

A court may not impose an additional categorical waiting period or require a defendant to serve a particular portion of the supervised-release term before considering the merits of a request for early termination. *United States v. Lowe*, 632 F.3d 996, 998–99 (7th Cir. 2011); *United States* v. Crisp, 770 F. Supp. 3d 1124, 1131 (C.D. Ill. 2025). The length of time served

may be considered, but only as part of an individualized assessment of the statutory factors. *Crisp* also recognized that the first year following imprisonment is often the most difficult period of reintegration and that successful completion of that year may provide persuasive evidence of rehabilitation and a reduced danger to the public. *Crisp*, 770 F. Supp. 3d at 1131.

Courts have wide discretion in determining whether early termination is appropriate. *United States v. Hook, 471 F.3d 766, 771 (7th Cir. 2006).* The defendant bears the burden of showing that the applicable § 3553(a) factors, the defendant's conduct on release, and the interest of justice support termination. *United States v. Faine*, No. 3:00-CR-30077, 2017 WL 3112742, at *2 (C.D. Ill. July 21, 2017).

The incorporated § 3553(a) factors are the nature and circumstances of the offense and the defendant's history and characteristics; the need for adequate deterrence, protection of the public, and necessary education, vocational training, medical care, or other correctional treatment; the applicable Guidelines and policy statements; the need to avoid unwarranted sentencing disparities; and the need to provide restitution. 18 U.S.C. §§ 3583(e)(1), 3553(a)(1), (a)(2)(B)–(D), and (a)(4)–(7). The Court must evaluate those considerations in light of the defendant's current circumstances rather than treating ordinary compliance as either automatically sufficient or categorically insufficient.

Section 3553(a)(2)(A), which concerns the seriousness of the offense, respect for the law, and just punishment, is not incorporated into § 3583(e). *Esteras v. United States*, 145 S. Ct. 2031, 2040 (2025). The Court therefore may not rely on those considerations for retributive purposes, although the nature and circumstances of the underlying offense may inform permissible considerations such as deterrence, protection of the public, and rehabilitation. *Id.*

Regarding the advisory Guidelines, section 5D1.4 provides:

> Any time after the expiration of one year of supervised release and after an individualized

> assessment of the need for ongoing supervision, the court may terminate the remaining term of supervision and discharge the defendant if the court determines, following consultation with the government and the probation officer, that the termination is warranted by the conduct of the defendant and in the interest of justice. *See*18 U.S.C. § 3583(e)(1).

U.S.S.G. § 5D1.4(b) (2025).

Application Note 7 goes on to provide a non-exhaustive list of factors a court may wish to consider when evaluating whether to terminate supervised release early, including:

> (i) any history of court-reported violations over the term of supervision;
>
> (ii) the ability of the defendant to lawfully self-manage (e.g., the ability to problem-solve and avoid situations that may result in a violation of a condition of supervised release or new criminal charges);
>
> (iii) the defendant's substantial compliance with all conditions of supervision;
>
> (iv) the defendant's engagement in appropriate prosocial activities and the existence or lack of prosocial support to remain lawful beyond the period of supervision;
>
> (v) a demonstrated reduction in risk level or maintenance of the lowest category of risk over the period of supervision; and
>
> (vi) whether termination will jeopardize public safety, as evidenced by the nature of the defendant's offense, the defendant's criminal history, the defendant's record while incarcerated, the defendant's efforts to reintegrate into the community and avoid recidivism, any statements or information provided by the victims of the offense, and other factors the court finds relevant.

U.S.S.G. § 5D1.4(b), cmt. N.7 (2025).

## IV

Although Donavan has completed only approximately fourteen months of formal supervision, that period does not capture the full extent of his transition from incarceration to progressively less restrictive conditions. Before beginning supervised release, he spent two months in a halfway house, four months subject to a halfway-house ankle monitor, and six months subject to an FLM monitor. He has now been outside prison for approximately two years without disciplinary incidents or drug use. The Court therefore declines to treat either the proportion of the three-year term completed or the characterization of his conduct as ordinary compliance as categorically dispositive.

Donavan's conduct during this period strongly favors termination. He has remained law-abiding, incurred no known violations, complied fully with every condition of supervision, and maintained a good relationship with his probation officer. He has also demonstrated an ability to manage his affairs lawfully: he has maintained stable housing and employment, and supervision has not been necessary to correct any reported misconduct. He has consistently reported as required and experienced no supervision-related problems.

This record amounts to more than bare compliance. Donavan has maintained sustained employment, advanced into skilled work, assumed union responsibilities, secured stable housing, supported a family, relied on strong prosocial relationships, and successfully completed the particularly difficult first year of reintegration following lengthy incarceration. After initially working for Amazon, he obtained employment in Arconic's laboratory department, joined United Steelworkers Local 105, and became a union steward. He is married, has a young daughter, and serves as a father to four stepchildren.

Donavan also has an established support network consisting of his wife, children, and extended family members who assisted with his transition from incarceration. His family relationships, stable living circumstances, sustained

employment, and workplace responsibilities provide meaningful prosocial structure capable of helping him continue to live lawfully without federal supervision. He has expressed an understanding of the seriousness and consequences of his past conduct and a desire to serve as a better role model for his children.

Donavan's institutional history and assessed risk further support that conclusion. He spent the final five years of his incarceration at a minimum-security facility without a fence and received a minimum-risk classification under the Bureau of Prisons' PATTERN system. His violation-free conduct since release is consistent with that assessment, and the record identifies no contrary risk assessment. He also had a Category I criminal history at sentencing and has committed no known violation or new offense during community reentry or supervised release.

The Court does not minimize the nature and circumstances of Donavan's offense. He distributed substantial quantities of oxycodone, supplied pills that were redistributed to nineteen-year-old Ryan Evins, and admitted that Evins ingested those pills and died. That conduct was exceptionally serious and properly bears on the Court's assessment of deterrence and public safety. Donavan, however, received a severe sentence of 240 months' imprisonment, that sentence in part intended to reflect the offenses's seriousness, provide a just punishment, and promote respect for the law.

In deciding whether supervision remains necessary, the Court may consider the underlying conduct insofar as it informs deterrence, protection of the public, and rehabilitation. But because § 3553(a)(2)(A) is not incorporated into § 3583(e), the Court may not continue supervision merely to impose further punishment, reflect the offense's seriousness, or promote respect for the law. Supervised release serves rehabilitation and transition into community life rather than punishment; punishment was served through imprisonment.

The Government emphasizes that the consequences of recidivism could be grave and that public protection is

especially important because a person died as a result of Donavan's underlying conduct. The individualized record, however, does not show that continued supervision is necessary to deter Donavan or protect the public. His minimum-risk classification, Category I criminal history, minimum-security placement, and complete absence of new offenses or supervision violations materially distinguish his present circumstances from those existing at sentencing. His skilled employment, union responsibilities, stable housing, family obligations, and strong support network further reduce the risk that he will return to criminal conduct.

At this point, Donavan's stable and lawful life—not the remaining obligation to submit to supervision—provides the most meaningful specific deterrent. His successful reentry also demonstrates that the possibility of early termination can reinforce compliance during the especially difficult period immediately following release and encourage supervisees to establish the benefits of a lawful life.

The Court has considered the Government's contention that Donavan has benefited from supervision and should continue receiving the rehabilitative resources of the Probation Office. The present record nevertheless shows that Donavan has already established stable employment, housing, family responsibilities, and community involvement while remaining violation-free, and therefore that additional correctional treatment or rehabilitative supervision would provide limited benefit. His ability to maintain those circumstances without any need for supervision to correct misconduct demonstrates that he can manage his life lawfully without continued intervention.

The Court has also considered the opposition of the Government, the Probation Office, and Donavan's supervising officer, as well as Donavan's reported statement that supervision was not much of an imposition. Those views are relevant, but the ultimate question remains whether an individualized assessment shows that termination is warranted by Donavan's conduct and the interest of justice.

The absence of substantial hardship does not outweigh the affirmative evidence that Donavan can remain law-abiding without continued federal supervision.

After weighing the nature and circumstances of the offense, Donavan's history and present characteristics, the need for deterrence and protection of the public, his rehabilitative needs, the applicable policy considerations, and his conduct since release, the Court finds that Donavan has carried his burden. His sustained rehabilitation, lawful self-management, low assessed risk, prosocial activities, stable family and employment circumstances, strong support network, and violation-free adjustment outweigh the Government's concerns regarding the portion of the term completed and the gravity of the underlying offense. Early termination is therefore warranted by Donavan's conduct and the interest of justice.

## V

For the reasons stated *supra,* the Court grants the counseled Amended Motion for Early Termination of Supervised Release and finds the Defendant's pro se Motion for Early Termination of Supervised Release (D. 123) moot.

*It is so ordered.*

Entered on November 15, 2026

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE